IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
               Plaintiff,       )
                                )
     v.                         )    No. 08 CR 207
                                )
ANDRE LINEAR,                   )
                                )
               Defendant.       )

                  MEMORANDUM OPINION AND ORDER

     On September 8, 2008 this Court conducted a one-day hearing on the motion to suppress that had been filed by defendant Andre Linear ("Linear"), who is charged with the knowing possession of a firearm (a Baretta .380 caliber semi-automatic pistol) after having previously been convicted of a felony offense (the current alleged offense is criminalized by 18 U.S.C. §922(g)(1) and is colloquially referred to as a "felon-in-possession" charge). This Court has given full consideration to the sharply different versions that were testified to by Linear and by the arresting officer, State Trooper Todd Wilhelmy ("Wilhelmy"), and it sets forth its ruling in this opinion.[1]

---

[1] Two other witnesses testified during the hearing: State Trooper Valerie Hofbauer ("Hofbauer") and, in rebuttal on Linear's behalf, Eric Williams ("Williams"). Because Hofbauer came on the scene after the critical events that either justified or did not justify (depending on whose version is believed) Wilhelmy's claimed retrieval of a weapon from Linear after a pat down, her testimony does not aid in this opinion's search for truth in that regard. Williams' testimony supported Linear's version in various respects, but he admittedly did not observe or hear the entire interchange between Linear and Wilhelmy. Hence this opinion will refer minimally to his testimony.

It should be added that following the hearing this Court granted counsel for the litigants a period of 14 days after their receipt of the hearing transcript within which they might wish to supplement their prehearing submissions. Delivery of the transcript to government counsel then took place on September 19, so that the 14-day clock ran out on October 3. Nothing further has been tendered by either party then or since--no doubt because the hearing testimony presented no surprises that had not been addressed in the prehearing filings.

Interestingly, the government's prehearing filing in claimed support of its position placed its principal reliance on the majority opinion of our Court of Appeals in its en banc decision in <u>United States v. Childs</u>, 277 F.3d 947 (7th Cir. 2002). This opinion will address that authority later, after the facts have first been developed.

By way of a threshold summary, this Court's evaluation of the critical testimony is that although some limited portions of Wilhelmy's testimony may have the ring of truth, his version of the controlling events cannot be credited, while on the other hand Linear's version is far more consonant with common sense--especially as to the circumstances of their initial encounter when both were driving on the Stevenson Expressway in the wee morning hours of May 27, 2007.[2] Because those

---

[2] That was on the Memorial Day weekend.

circumstances control the propriety--more accurately the lack of propriety--of Wilhelmy's later failure to let Linear go on his way promptly after Wilhelmy had made his traffic stop, it proves unnecessary for this opinion to explore the later events that flowed from that failure.

In terms of that initial encounter, it is most appropriate to begin with one fact on which the differing versions proffered by Linear and Wilhelmy basically agree: Linear's having moved from a right-hand lane on the Stevenson Expressway, where he was driving at about 1 a.m. on May 27, 2007, to the left, followed quickly by Linear's moving back to the right in another lane change.[3] Two things are known (and really undisputed) in that regard:

1. Linear was not speeding. Wilhelmy specifically said that **he** was traveling faster than Linear, and in any event no citation for speeding was added to the six citations ultimately written up against Linear.

2. Linear was not under the influence of alcohol. That too was expressly confirmed by Wilhelmy's observation,

---

[3] As Wilhelmy has it, Linear began those movements from the second lane from the right on the four-lane highway--a story that is necessary to account for Wilhelmy's denial of his cutting in front of Linear from a position on the right-hand shoulder. Linear's testimony, which as later explained is credible while Wilhelmy's is not, is that he had been driving in the right-hand-most lane when Wilhelmy's entry into that lane from the shoulder forced Linear's quick movement to the left to avoid rear-ending Wilhelmy's car.

as to which more will be said later.

So there is an obvious question posed by those circumstances: What would cause a driver who was traveling at a normal speed, and who was not driving erratically, to make the lane-to-lane movements to which <u>both</u> Linear and Wilhelmy testified? Under Wilhelmy's version of events there would have been no reason at all to do that, for Linear was driving straight ahead in an otherwise clear expressway lane at 1 a.m. In candor, that version is simply not credible. By contrast, Linear has offered a wholly credible explanation: Wilhelmy's having pulled directly in front of him from the right (that is, from the shoulder, because Linear was in the farthest-to-the-right normal traffic lane), requiring Linear (1) to engage in a normal defensive driving measure by hitting his brakes and then cutting to the left to avoid rear-ending Wilhelmy's car, and (2) then, because that forced him into the path of another car traveling at a higher rate of speed, to move to another lane and then ultimately back to his right. That explanation is entirely plausible, is reinforced by Williams' testimony (Tr. 106:22-24 and 109:19 to 110:2) and is wholly consistent with the earlier-stated facts on which Linear and Wilhelmy agree. Accordingly this Court credits it.

What happened next is in dispute. According to Wilhelmy, his observation of Linear's lane changing led him to activate his

4

Mars lights and then his siren so as to cause Linear to pull over and stop, with Wilhelmy's car then stopping on the shoulder a half car length behind Linear's car. That causal relationship might have been legitimate if it had indeed been grounded on Wilhelmy's perhaps reasonable suspicion, based on a premise that Linear's car movements might have been the product of his driving while impaired by alcohol or might otherwise have reflected improper lane usage. But given the far more likely explanation of the initial event that the preceding paragraph has already credited, it is much more probable that Wilhelmy's reaction of bringing Linear to a stop was triggered by something else that Linear did.[4]

In that respect Linear proffers an innocuous explanation--he says he pulled up to ride parallel to Wilhelmy's car, rolled down the window on the passenger side of his Cadillac and called out (more than once) "Are you okay?" Now this Court was of course not there--it may well have been that Linear's comments were less solicitous than that because, after all, Wilhelmy had cut him off and compelled him to engage in the defensive driving moves described in the opinion. It seems entirely possible--indeed, perhaps more likely--that Wilhelmy's response of requiring Linear

---

[4] After all, this Court has already found that Linear's lane changing was triggered by Wilhelmy's cutting in front of him. And by definition <u>that</u> cause had to be--and was--known by Wilhelmy.

5

to pull over, coupled with what ensued thereafter, was an angry reaction to some provocation (rather than polite inquiry) that was called out by Linear.

Alternatively, if Wilhelmy were somehow to be given the benefit of a considerable doubt (something to which the preceding paragraphs of the text demonstrate that the most probable nature of the occurrence really does not entitle him), perhaps his observation of Linear's lane changes might have created a reasonable suspicion of a possible driving violation by Linear (whether a DUI offense or a lesser offense of improper lane usage). But as already explained here, the far more plausible explanation, and the one that is accepted by this Court, is that given by Linear.

Before the main discussion continues, it may be said parenthetically that this Court also does not credit Wilhelmy's testimony as to the ubiquitous license-plate-light-out violation that is sometimes offered up by traffic officers to bolster an otherwise shaky position. In that respect Wilhelmy has testified persuasively, and in accordance with common sense, that such a violation (if it does exist) more typically results in a warning rather than a ticket if a driver is stopped for that alone. But over and above Linear's vigorous denial that the light was really out, it should be remembered that here Linear ended up being tagged with six alleged violations in the citation issued against

him--and in that light[5] it is simply not probable that, with the book being thrown at Linear, the license-plate-light-out violation (if it existed at all) would simply have been omitted from the panoply of charged offenses.

And there are some further factors that also discredit Wilhelmy as a witness. As one more example, he has denied that Linear questioned him as to why Linear was being arrested, something that totally defies common sense. It is difficult to conceive of anyone, under the circumstances described by either Linear or Wilhelmy, who would not make such an inquiry. So why would Wilhelmy deny the existence of a nonmaterial fact? Regrettably that is what frequently happens when witnesses get too creative with their departures from, rather than their trying to stick to, the truth. As Sir Walter Scott so poignantly observed in Marmion:

> Oh what a tangled web we weave,
> When first we practice to deceive.

In the global picture, setting out those examples might perhaps be thought of as a minor digression (although they do provide more demonstrations of Wilhelmy's lack of credibility). But more to the main point at issue on the current motion, this opinion turns to the next respect as to which the testimony of the two principals agrees: the physical location of the two

---

[5] No bad pun intended.

vehicles once they were stopped on the shoulder, with Linear's vehicle being in front and Wilhelmy's vehicle being behind it about a half car length. According to Wilhelmy, who has demonstrated that he has down pat all of the formulaic vocabulary needed for his efforts to justify his conduct, Linear then engaged in "furtive" movements--a characterization even more formulaic than (1) Wilhelmy's carefully-phrased testimony that he had "a reasonable suspicion, though not probable cause," and (2) his volunteered recitals that he stored this item and that item in his head so as to support the essential "totality of the circumstances" determination (on that score, see n.7).

Wilhelmy's testimony as to Linear's claimed furtiveness is totally unconvincing. If Wilhelmy was really located where he described himself as being--midway between being in his car and out of his car, with his left foot on the ground (his driver's car door being open) and his right foot still in his car--he simply could not have observed what his testimony described. If that physical scenario were to be believed, Williams (who was seated in the back seat of Linear's Cadillac directly behind Linear) was positioned directly between Wilhelmy and Linear, as was also true of the Cadillac's driver's seat and driver's seat headrest. Those things would have blocked Wilhelmy from a clear view of Linear's movements (if any) within his car. It should also be noted that with Wilhelmy being positioned as he has

8

testified--to the left of his own driver's seat--the need to angle his vision to the right in any effort to observe Linear would pose added obstructions to such observation.

In short, lacking Superman's x-ray vision, Wilhelmy has simply fabricated his story about what he observed Linear doing. That claimed observation fails as a basis for any assertion of a reasonable suspicion to serve as a possible foundation for Wilhelmy's ensuing conduct.

In summary, when Wilhelmy ordered Linear out of his car, Wilhelmy had no basis for any possible reasonable suspicion except for the already-described lane movement, which has already been held <u>not</u> to be suspicious at all, but rather an entirely appropriate driver's response to a risk suddenly created by Wilhelmy himself. So the ensuing confrontation that took place was instigated by Wilhelmy's actions and not Linear's.

In that respect it is clear that Wilhelmy perceived no threat from Linear--he didn't draw his weapon or take any other preventive measure when, as he would have it, Linear returned his hands to his pockets rather than keeping them raised (see, e.g., Tr. 51-54).[6] On that score both Linear and Wilhelmy agree that Linear explained he was just getting his identification to

---

[6] Despite some positive response by Wilhelmy to leading questions about being concerned for his safety (see, e.g., Tr. 53:13-25), he did not manifest those concerns in any way that might have been expected of a reasonable officer if Wilhelmy's version of events were accurate.

9

exhibit it to Wilhelmy. And before Wilhelmy offered up his formulaic "reasonable suspicion, though not probable cause" explanation, he expressly acknowledged in his testimony that Linear didn't sway or stagger and that there was no evidence of alcohol usage. Nothing in Linear's demeanor or gait, nothing in his speech, nothing else provided any reasonable suspicion that his lane usage had been improper, nor did anything in his conduct pose any threat to Wilhelmy's safety, as Wilhelmy's own objective conduct (or lack of conduct) confirmed. Importantly, under all the circumstances there was no occasion--no justification--for a pat down search (just as there is no justification for a pat down in a routine traffic stop for an observed violation, such as an expired license plate, that can justify the issuance of a citation).[7]

Those then are the critical facts that emerged from the hearing. As for the law applicable to those facts, this Court

---

[7] It became apparent early in Wilhelmy's testimony, and it continued to be clear thereafter, that he recognized his vulnerability on that score. At every opportunity he took the occasion to volunteer that this item or that item was "just a clue in my head," was "put...in the back of my head," was "another clue for me," was "another red flag for me" and was a "question that I had in my head" (Tr. 51:2-4, 52:25 to 53:1, 70:22 and 79:20). All of those characterizations have plainly been intended by Wilhelmy to provide building blocks for his asserted concern for his safety, and in turn to support the claimed propriety of a pat down that assertedly produced the weapon at issue. But this Court's objective view of the real totality of the circumstances has led it to reject Wilhelmy's revisionist history in favor of the conclusions set out in the text.

has studied the en banc decision in Childs with care, and it turns out to undercut rather than support the government's opposition to Linear's motion to suppress.

What divided the Court of Appeals in Childs was the question of the status for Fourth Amendment purposes of further questioning by an officer after a justified investigatory traffic stop--an issue not posed by this case. It was in that context that Judge Cudahy, speaking in a lengthy concurrence in the judgment, characterized the original panel's majority opinion in Childs as "opening the floodgates for [a] major revision of Fourth Amendment law." But that issue differs markedly from the issue posed by this case, which deals with the propriety of further detention and a search by the officer--and in that regard the en banc majority opinion written by Chief Judge Easterbrook cuts against rather than in favor of the government's position. Here is what the opinion says in the brief portions that are most relevant here (277 F.3d at 952):

> Questioning that prolongs the detention, yet cannot be justified by the purpose of such an investigatory stop, is unreasonable under the fourth amendment.
>
> \*        \*        \*
>
> A person stopped on reasonable suspicion must be released as soon as the officers have assured themselves that no skullduggery is afoot.

In other words, once any reasonable suspicion (if it existed at all) has been dissipated, any further officer activity--continued

11

detention or, a fortiori, an invasive search--runs afoul of the Fourth Amendment.

That is precisely the situation that existed once any potential reasonable suspicion on Wilhelmy's part proved unfounded, as this Court has held. Even if Wilhelmy, despite the reality of the situation as set out here, had decided (however arbitrarily) to charge Linear with improper lane usage, his only legitimate action would have been to write up a citation to that effect and send Linear and his passengers on their way. And of course the most appropriate course would have been <u>not</u> to issue a citation and to bid Linear farewell. Either way, Wilhelmy cannot instead bootstrap himself, by his own ensuing improper conduct, into <u>creating</u> a claimed valid search and seizure.

In conclusion, this Court regrets to say that Wilhelmy has proved himself to be more lacking in credibility than any other law enforcement witness in its recollection.[8] And on the

---

[8] This opinion has not sought to be exhaustive in identifying the respects in which Wilhelmy's testimony is suspect (or worse). For example, because this opinion has carried the account up to but not beyond the time of Wilhelmy's unconstitutional search, it has had no occasion to speak of the trooper's assertion that Linear tried to run away just as the first assisting squad car pulled onto the right shoulder, which Wilhelmy says led him to draw his gun and direct Linear to get down on the ground, at which point the gun Wilhelmy claimed to have seen earlier assertedly traveled down Linear's pants leg and reached his ankle area, where Wilhelmy assertedly retrieved it (Tr. 59:8-23). But importantly the initial assisting trooper, Ms. Hofbauer, testified that she did <u>not</u> see Linear running (Tr. 95:19-20)--she said that from just 10 feet away (where she stopped her squad car) she only saw Wilhelmy and Linear

ultimate question as to the consequence of <u>his</u> inappropriate conduct, the clear preponderance of the evidence as to the principal witnesses' comparative credibility also calls for discrediting Wilhelmy's testimony as to his assertedly having spotted a suspicious bulge on Linear's person--something that is claimed somehow to justify a pat down that, under the totality of the circumstances, was <u>not</u> called for in the interest of officer safety or otherwise.  And that in turn takes totally out of play the other decision on which the United States seeks to place reliance, the per curiam opinion in <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 111 (1977), which upheld an order to a driver to get out of his car--an order that was followed by a permissible pat down search once the officer then observed a bulge in the driver's jacket.

    For all the reasons stated here--the totality of the circumstances in the true sense, and not as Wilhelmy has used the phrase mechanistically--Linear's motion to suppress is granted. This action is set for a next status hearing at 8:45 a.m. October 15, 2008, at which time this Court is prepared to waive Linear's presence if he chooses not to appear after conferring with his counsel.

---

struggling (a struggle that Wilhelmy said began after he had purportedly located a pistol in Linear's waistband--Tr. 80:2-3), nor did she ever see the gun that Wilhelmy attributed to Linear (Tr. 96:19 to 97:14).  Once again Wilhelmy's credibility must be found seriously wanting.

13

Finally, it cannot be gainsaid that this opinion and its ruling add materially to the complexity of the case and its prosecution. Hence the time exclusion for Speedy Trial Act purposes, which through today's date has come within 18 U.S.C. §3161(h)(1)(F), is extended through October 15, 2008 under 28 U.S.C. §3161(h)(8)(A) and (B)(ii).

```
                                  _____
                                  Milton I. Shadur
                                  Senior United States District Judge
```

Date:  October 8, 2008